IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CA No.: 1:23-cv-00585-CCE-LPA

| | |
|---|---|
| TAMEKA FERGES and DARRICK PAYLOR, on behalf of themselves and all others similarly situated, | ) ) ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) |
| GKN DRIVELINE NORTH AMERICA, INC., | ) ) |
| | ) |
| *Defendant.* | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR AMENDED MOTION TO CERTIFY THIS MATTER AS A COLLECTIVE ACTION AND FOR COURT-AUTHORIZED NOTICE TO BE ISSUED UNDER SECTION 216(B) OF THE FAIR LABOR STANDARDS ACT**

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................ 2

      A.    Employees Were Subject to the Same Common Timekeeping
            Practices and Compensation Policies. ............................................................ 2

            1.    Defendant's Pre-Shift Timekeeping Policies ...................................... 3

            2.    Defendant's Post-Shift Timekeeping Policies.................................... 4

            3.    Defendant's Meal Break Policies ........................................................ 5

            4.    Defendant's Policies Applied to All Employees Equally, and
                  Employees Performed Similar Job Duties .......................................... 5

      B.    Employees Performed Unpaid Work Beyond Scheduled Shift Times. .......... 6

            1.    Employees Performed Pre-Shift Off-the-Clock Work. ...................... 6

            2.    Employees Performed Post-Shift Off-the-Clock Work..................... 7

            3.    Employees Worked Through All or Part of Unpaid Meal
                  Breaks. ................................................................................................ 8

III.  ARGUMENT ........................................................................................................ 9

      A.    The Standard for Certification of a FLSA Collective ................................... 9

      B.    Plaintiffs Are Similarly Situated................................................................. 12

            1.    Pre-Shift Off-the-Clock Work .......................................................... 12

            2.    Post-Shift Off-the-Clock Work......................................................... 14

            3.    Off-the-Clock Work Through Unpaid Meal Breaks......................... 15

      C.    The Proposed Notice to Potential Opt-Ins is Appropriate, Accurate,
            and Informative. .......................................................................................... 16

            1.    An Updated Production of a List of Putative Collective
                  Members is Necessary to Facilitate Notice. ..................................... 17

            2.    Notice Should Be Sent Via Email, Text Message, and Regular
                  Mail. .................................................................................................. 18

IV.     CONCLUSION ...................................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Citicorp Credit Servs., Inc.*,
  93 F.Supp.3d 441 (M.D.N.C. Mar. 20, 2015).......................................................... 11, 16

*Baylor v. Homefix Custom Remodeling Corp.*,
  443 F.Supp.3d 598 (D. Md. Mar. 6, 2020) ................................................................ 18, 19

*Butler v. DirectSAT USA, LLC*,
  876 F.Supp.2d 560 (D. Md. Apr. 10, 2012)........................................................ 12, 18, 19

*Byard v. Verizon W. Va., Inc.*,
  287 F.R.D. 365 (N.D.W.Va. Oct. 24, 2012) .................................................................... 17

*Chapman v. Saber Healthcare Grp., LLC*,
  623 F.Supp.3d 664 (E.D. Va. 2022)................................................................................. 17

*Clark v. Williamson*,
  No. 1:16-cv-1413, 2018 WL 1626305 (M.D.N.C. Mar. 30, 2018) ................................. 10

*Cole v. Universal Health Care/Blumenthal Inc.*,
  No. 1:24-cv-576, 2025 WL 2378991 (M.D.N.C. Aug. 15, 2025)........................ 9, 10, 11

*De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc.*,
  338 F.Supp.2d 649 (E.D.N.C. 2004) ............................................................................... 12

*Gionfriddo v. Jason Zink, LLC*,
  769 F.Supp.2d 880 (D. Md. 2011).................................................................................... 12

*Graham v. Hall's Southern Kitchens, LLC*,
  331 F.R.D. 619 (D.S.C. Nov. 27, 2018) .......................................................................... 18

*Hoffmann-La Roche Inc. v. Sperling*,
  493 U.S. 165 (1989) ................................................................................................... 16, 17

*Hollis v. Alston Pers. Care Servs., LLC*,
  No. 1:16-cv-1447, 2017 WL 3327591 (M.D.N.C. Aug. 3, 2017)................................... 10

*Irvine v. Destination Wild Dunes Mgmt., Inc.*,
  132 F.Supp.3d 707 (D.S.C. Sep. 14, 2015) ............................................................... 18, 19

*Lewis v. Precision Concepts Grp., LLC*,
  No. 1:18-cv-64, 2019 WL 13143749 (M.D.N.C. July 29, 2019).................................... 18

iv

*Long v. CPI Sec. Sys., Inc.*,
  292 F.R.D. 296 (W.D.N.C. 2013) ................................................................... 10

*Rehberg v. Flowers Foods, Inc.*,
  No. 3:12-cv-596, 2013 WL 1190290 (W.D.N.C. Mar. 22, 2013) ................................. 17

*Robinson v. Empire Equity Grp., Inc.*,
  No. WDQ-09-1603, 2009 WL 4018560 (D. Md. Nov. 18, 2009) ........................... 10, 12

*Roldan v. Bland Landscaping Co.*,
  341 F.R.D. 23 (W.D.N.C. 2022) ............................................................... 16, 18

*Romero v. Mountaire Farms, Inc.*,
  796 F.Supp.2d 700 (E.D.N.C. 2011) ............................................................ 12

*Solais v. Vesuvio's II Pizza & Grill, Inc.*,
  No. 1:15-cv-227, 2016 WL 1057038 (M.D.N.C. Mar. 14, 2016) ............................ 9, 11

*Staley v. UMAR Services, Inc.*,
  630 F.Supp.3d 707 (M.D.N.C. Sep. 23, 2022) ...................................... 9, 11, 16

*Swales v. KLLM Transport Services, L.L.C.*,
  985 F.3d 430 (5th Cir. 2021) .................................................................. 11

**Statutes**

29 U.S.C. § 201 *et seq.* ......................................................................... 1

29 U.S.C. § 216(b) ............................................................................ 1, 9

N.C.G.S. §§ 95-25.1 *et seq.* .................................................................... 1

# I.     INTRODUCTION[1]

Named Plaintiffs Tameka Ferges and Darrick Paylor[2] bring this suit on behalf of themselves and workers (collectively, "Plaintiffs" or "Employees") employed by Defendant GKN Driveline North America, Inc. ("Defendant" or "Defendant GKN" or "the Company") to recover for unpaid overtime compensation. Defendant's manufacturing and/or assembly line employees who make up the proposed collective were/are subject to the same unlawful policies requiring the performance of (1) pre-shift off-the-clock work, (2) post-shift off-the-clock work, or (3) off-the-clock work during unpaid meal breaks resulting in unpaid overtime hours worked in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*[3] Accordingly, Plaintiffs seek certification of a collective action pursuant to § 216(b) of the FLSA and authorization for the issuance of notice to the following sub-classes:

### Proposed Post-2020 Pre-Shift Off-the-Clock Work Collective

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Roxboro on the manufacturing floor at any time between January 1, 2020 through the present who may have been subjected to Off-the-Clock ("OTC") required work activities such as obtaining and putting on personal protective equipment ("PPE"), gathering materials, documenting production, or speaking to coworkers about production issues at least once prior to the start of their shift ("Pre-Shift Off-the-Clock Work Class").

---

[1] Unless otherwise stated, docket references are to the *Ferges* docket, No. 1:23-CV-585.

[2] At the time of this motion, Plaintiffs have a pending motion for leave to amend their complaint to add additional Named Plaintiffs. *See* Dkt. 124.

[3] Plaintiffs also seek class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure in this action for Defendant's violations pursuant to the North Carolina Wage and Hour Act ("NCWHA"), N.C.G.S. §§ 95-25.1 *et seq. See* Dkt. 128.

1

### Proposed Post-2020 Post-Shift Off-the-Clock Work Collective

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Roxboro on the manufacturing floor between January 1, 2020 through the present who may have been subjected to Off-the-Clock ("OTC") required work activities such as cleaning workstations, talking to coworkers about production, and removing and/or disposing of personal protective equipment ("PPE") at least once following the end of their shift ("Post-Shift Off-the-Clock Work Class").

### Proposed Post-2020 Meal Break Off-the-Clock Work Collective

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Roxboro on the manufacturing floor between January 1, 2020, through  2023 or the date on which GKN began paying hourly employees for their meal breaks, who may have been subjected to Off-the-Clock ("OTC") required work activities such as removing and disposing of personal protective equipment ("PPE") and washing hands of hazardous chemicals, ultimately reducing GKN's promised "duty free" thirty (30) minute meal break policy, at least once during their meal break ("Meal Break Off-the-Clock Work Class").

## II.     FACTUAL BACKGROUND

### A.     Employees Were Subject to the Same Common Timekeeping Practices and Compensation Policies.

Defendant promises to pay its Employees for all hours worked and nominally prohibits off-the-clock work.[4] However, beginning in early 2020, Defendant initiated a policy regarding time records, meal and rest breaks,[5] and a revised attendance policy[6] that virtually requires off-the-clock work. Despite a policy that GKN promises to pay for all

---

[4] Dkt. 70-11, Attendance Company Policy (revision date 02/02/2020), at 3 ("GKN Automotive pays employees for all time worked. Off-the-clock work is strictly prohibited.").

[5] Dkt. 70-12, Time Records, Meal & Rest Periods Company Policy (release date of January 2020 and revision date of March 2020).

[6] Dkt. 70-11, Attendance Company Policy.

2

hours worked, these revised post-2020 policies fail to ensure Employees receive compensation for all hours worked.

### 1. Defendant's Pre-Shift Timekeeping Policies

Generally, Defendant required its Employees to "clock in at the beginning of their shift and clock out at the end of their shift."[7] However, Defendant required that Employees "may not clock in more than 3 minutes prior to the start of his/her shift."[8] Still, Defendant required its Employees "to be at their work station (or the designated [sic] meeting place where applicable) at the start of their shift."[9] Defendant's timekeeping policies do not mention or account for any required preparatory work, such as putting on personal protective equipment ("PPE").[10]

If an Employee clocked in earlier than three minutes prior to their shift start, the Employee would be subject to discipline.[11] In fact, if an employee clocked in four or more minutes before the start of their shift, they would receive a quarter of a point.[12] If an employee clocked in four or more minutes early more than three times, the employee would receive a half a point.[13] After a series of warnings, the accumulation of six points results in

---

[7] Dkt. 70-11, Attendance Company Policy, at 3.

[8] *Id.*

[9] *Id.*

[10] *See id.*; *see also* Dkt. 70-8 at 16 (GKN handbook outlining PPE be worn on manufacturing floor); Ex. B, Deposition of Justin LaQuay ("LaQuay Depo") at 45:19-46:3 (HR Project Specialist Justin LaQuay testifying that he is "not aware" of any GKN policy requiring employees clock in before putting on PPE).

[11] Dkt. 70-11 at 4-5 (penalty schedule for clocking in early and clocking out after the end of a shift).

[12] *Id.* at 5.

[13] *Id.*

3

the employee being fired.[14] Points remain active on an employee's record for one full year.[15]

### 2. Defendant's Post-Shift Timekeeping Policies

Defendant initiated a similar policy with regard to post-shift timekeeping.[16] Defendant permitted Employees to clock out up to three minutes before the end of their shift.[17] However, clocking out four or more minutes early would result in discipline.[18]

A similar grace period was not applied to clocking out after an Employee's shift had ended.[19] If an Employee clocked out after their shift ended, they would be subject to discipline, though seemingly not on a graduated point scale.[20] Further, if Employees clocked out after the end of their shift *at all* they would be given a quarter of a point.[21] Employees were strictly required to clock in and clock out only at the beginning and end of their shifts.[22]

---

[14] *Id*. at 8.

[15] *Id*.

[16] Dkt. 70-12, Time and Break Policy, at 2.

[17] *Id*. ("An employee may clock out up to three (3) minutes prior to the end of his/her shift.").

[18] *Id*.

[19] *Id*. ("Employees may not clock out after the end of the shift unless the employee has received approval from his/her manager to continue work after the end of his/her shift.")

[20] *Id*. ("If an employee clocks out after the end of the shift without approval or four (4) or more minutes prior to the end of the shift without approval, the employee may be subject to discipline.").

[21] Dkt. 70-11, Attendance Policy at 5 (a quarter point received for "Clocking out after the end of the shift.").

[22] *Id*. at 3 ("Hourly employees are required to clock in at the beginning of their shift and clock out at the end of their shift.").

### 3. Defendant's Meal Break Policies

Defendant promised to provide all hourly employees "with a 30-minute duty-free meal period."[23] Pursuant to the policy, Employees are promised to be "completely relieved of their job responsibilities during their meal period."[24] This meal period was to be unpaid.[25] However, employees working a 12-hour shift "*may* be provided with a paid 30-minute meal period."[26] Regardless, Defendant required Employees to clock out for their meal period exactly at its start and clock in exactly at its end.[27] Employees who took more than 30 minutes for their meal period or do not clock out for their meal periods could be subject to discipline.[28]

### 4. Defendant's Policies Applied to All Employees Equally, and Employees Performed Similar Job Duties

Plaintiffs worked for Defendant as hourly, non-exempt employees responsible for operating machines to produce automotive parts along production lines at Defendant's Roxboro manufacturing facility.[29] Plaintiffs' duties generally included similar tasks related

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.* at 3-4.

[28] *Id.* at 4.

[29] *See* Dkt. 70-3, Heather Weis (Corporate Manager) ("Weis Depo."), at 28:23-30:7 (estimating 75% of Defendant's hourly employees operate on the manufacturing line); Dkt. 70-4, Frances Lee (HR Director for Roxboro) ("Lee Depo."), at 144:2-22 (most employees are machine operators). *See also* Dkt. 70-19 ¶ 1, Opt-In Rhonda Johnson ("Johnson Decl."); Dkt. 70-20 ¶ 1, Opt-In Tamika Brandon ("Brandon Decl."); Dkt. 70-21 ¶ 1, Opt-In Tonya Farmer ("Farmer Decl."); Dkt. 70-22 ¶ 1, Opt-In Shantiega Ford ("Ford Decl."); Dkt. 70-23 ¶ 1, Opt-In Gregory Keever ("Keever Decl."); Dkt. 70-24 ¶ 1, Opt-In Susan Long ("Long Decl."); Dkt. 70-25 ¶ 2, Opt-In Joseph Hairston ("Hairston Decl."); Dkt. 70-26 ¶

to the manufacturing of automotive parts, including but not limited to receiving daily assignments, monitoring and maintaining machines, cleaning workstations, and attending shift-transition meetings.[30] Plaintiffs performed similar duties and worked similar hours.[31] Most importantly, all Employees were subject to Defendant's same policies and practices that encouraged off-the-clock work.[32]

## B. Employees Performed Unpaid Work Beyond Scheduled Shift Times.

### 1. Employees Performed Pre-Shift Off-the-Clock Work.

Despite Defendant's written policies, Employees would regularly arrive at the Roxboro plant anywhere from ten to thirty minutes before the start of their shift.[33] In fact,

---

1, Opt-In Tamara Barton ("Barton Decl."); Dkt. 70-27 ¶ 1, Opt-In Tracy Booze ("Booze Decl."); Dkt. 70-28 ¶ 1, Opt-In Antwan Glover ("Glover Decl.").

[30] Dkt. 70-17, Deposition of Named Plaintiff Tameka Ferges ("Ferges Depo."), at 28:14-30:13 (explaining work duties); Dkt. 125-6 ("Glover Depo") at 55:6-56:9 (same); Johnson Decl., ¶¶ 2-3 (same); Brandon Decl., ¶ 2 (same); Farmer Decl., ¶ 2 (same); Ford Decl., ¶ 2 (same); Keever Decl., ¶¶ 1-4 (same); Long Decl., ¶ 2 (same); Hairston Decl., ¶¶ 2-3 (same); Barton Decl., ¶ 2 (same); Booze Decl., ¶ 2 (same); Glover Decl., ¶ 2 (same).

[31] *Supra* note 30; *see also* Ferges Depo., at 35:20-38:12 (8.5 hour shifts and 10-12 hour shifts alternating based on production demands); Ford Decl., ¶ 3 (same); Keever Decl., ¶ 5 (same); Long Decl., ¶¶ 3-4 (same); Hairston Decl., ¶¶ 5-6 (same);, Booze Decl., ¶ 3 (same); Johnson Decl., ¶ 4 (8.5 hour shifts 5-7 days straight); Glover Decl., ¶ 3 (same); Barton Decl., ¶¶ 3-4 (same); Brandon Decl., ¶¶ 3-4 (same); Farmer Decl., ¶ 3 (8.5 hour shifts).

[32] *See* Dkt. 70-11, Attendance and Punctuality for Hourly Employees (Feb. 2020); Dkt. 70-12, Time Records, Meal & Rest Periods (March 2020); Dkt. 70-8 at 16 (PPE requirements).

[33] Ferges Depo., at 176:21-179:14 (20-30 minutes pre-shift work required every shift, including meeting with supervisors and preparing machines to run on time); Glover Depo at 90:6-10 (arriving fifteen minutes early to prepare work area); Dkt. 125-4 ("Ford Depo") at 38:9-17 (getting to work early to put on PPE); Keever Decl., ¶ 7 (explaining pre-shift work); Long Decl., ¶¶ 7-8 (same); Johnson Decl., ¶¶ 6-7 (same); Glover Decl., ¶¶ 5-7 (same); Brandon Decl., ¶¶ 7-10 (same); Farmer Decl., ¶¶ 6-8 (same); Ford Decl., ¶¶ 5-7 (same); Hairston Decl., ¶¶ 11-13 (same); Barton Decl., ¶ 7 (same); Booze Decl., ¶¶ 5-8 (same).

Employees needed to begin work approximately fifteen to twenty minutes before their scheduled start times to perform pre-shift activities, including but not limited to attending pre-shift meetings, communicating with the previous shift about issues, and donning required personal protective equipment ("PPE") consistent with Defendant's written PPE policies.[34] Such mandatory PPE included safety glasses, ear plugs, and steel-toed boots which were stored in locker rooms because they were covered in toxic machining oils and metal shavings.[35] Notably, Defendant required that Employees be at their machine ready to work at the start of their shift, and Employees who were not ready would be disciplined.[36]

### 2. Employees Performed Post-Shift Off-the-Clock Work.

Similarly, Employees would regularly be required to work beyond their scheduled shift time in order to complete their tasks for the day.[37] Employees would regularly have

---

[34] *Supra* note 33; Dkt. 70-8 at 16 (GKN handbook outlining PPE be worn on manufacturing floor); Ford Depo at 135:23-136:15 (putting on PPE, going to production floor, and then clocking in); Dkt. 125-5 ("Marsh Depo") at 38:08-40:11 (explaining that his colleagues often requested assistance as soon as he entered the plant and before he clocked in); 124:05-125:24 (detailing how frequently he was required to assist his colleagues by performing pre-shift activities); Brandon Decl., ¶¶ 7-8, 10 (required to don PPE before going to production floor); Farmer Decl., ¶ 6 (same); Ford Decl., ¶¶ 5-6 (same); Barton Decl., ¶ 7 (same); Dkt. 70-27, Booze Decl., ¶ 6 (same).

[35] Dkt. 70-8 (policy noting required PPE); Brandon Decl. ¶ 7 (putting PPE on at work given dangerous materials); Barton Decl. ¶ 7 (same); Booze Dec. ¶ 6 (same).

[36] Dkt. 70-11, Attendance Policy 2020, at 4 (Defendant's policy applies ½ disciplinary point to Employees "[c]locking in any time after the start of the shift up to 60 minutes after the start of the shift"); *id.* at 3 ("Employees are expected to be at their work station [ ] at the start of their shift."); Barton Decl. ¶ 8 ("We were instructed not to clock in until three (3) minutes before our scheduled shift start, but we were also expected to have our workstation completely put together by the precise scheduled shift start.").

[37] Ferges Depo., at 189:24-194:22 (15-20 minutes post-shift work required, including "handoff meetings," cleaning, preparing presentable floors for company representatives

7

to spend time removing PPE, cleaning, completing additional work tasks, or facilitating the shift transitions.[38] Management was aware of, and often directed, this practice.[39] Despite this knowledge, Defendant did not compensate Employees for hours worked beyond their scheduled shifts.[40]

3. <u>Employees Worked Through All or Part of Unpaid Meal Breaks.</u>

Despite Defendant's promise to every hourly Employee that they would receive a meal break for each shift,[41] Employees regularly needed to work through all or part of their meal breaks in order to wash oil, grease, and hazardous chemicals from their hands and body and navigate far distances from their departments to break rooms, regularly reducing their meal breaks by approximately 10 to 15 minutes, particularly because Employees

---

from Honda, Toyota, etc., and completing all work with the machines); Marsh Depo at 73:11-74:8 (punching out and getting called back to troubleshoot issues); Ford Depo at 67:3-25 (clocking out, then washing oil and grease off hands and removing PPE); Johnson Decl., ¶¶ 8-10 (describing post-shift activities); Brandon Decl., ¶¶ 11-13 (same); Ford Decl., ¶¶ 8-10 (same); Dkt. 70-23, Keever Decl., ¶¶ 8-9 (same); Long Decl., ¶¶ 9-10 (same); Hairston Decl., ¶¶ 14-16 (same); Barton Decl., ¶¶ 12-14 (same); Booze Decl., ¶¶ 9-10 (same).

[38] *Supra* note 37.

[39] Ferges Depo., at 84:21-86:13 (complained to HR about unpaid hours worked); Ford Depo at 70:21-71:21 (complained about having to remove PPE after clocking out, but the practice continued); Johnson Decl., ¶¶ 11-12 (complaints about paychecks not reflecting all hours worked went unresolved); Brandon Decl., ¶¶ 23-24 (same); Farmer Decl., ¶¶ 4-5, 14 (same); Ford Decl., ¶¶ 16-17 (same); Keever Decl., ¶¶ 15 (same); Long Decl., ¶ 17 (same); Hairston Decl., ¶¶ 13, 16, 25-28 (same); Barton Decl., ¶¶ 11, 14, 21-26 (same); Booze Decl., ¶¶ 8, 10, 21-22 (same); Dkt. 70-28, Glover Decl., ¶¶ 7, 10-11 (same).

[40] *Supra* note 39.

[41] Dkt. 70-8, GKN Employee Handbook 2020, at 18; Dkt. 70-11, Attendance Policy 2020 at 3-4 (stating, *inter alia*, "[h]ourly employees are completely relieved of their job responsibilities during their meal period"); Dkt. 70-12, Time Records Policy 2020 3 ("Employees are completely relieved of their job responsibilities during their meal period.").

8

needed to be back from meal breaks within thirty minutes.[42] Thus, rarely, if ever, were Employees allowed to enjoy the full 30 minute meal break they were promised.[43]

## III.  ARGUMENT

### A. The Standard for Certification of a FLSA Collective

The FLSA allows employees to maintain an action against an employer for unpaid overtime pay on behalf of themselves and all others similarly situated. 29 U.S.C. § 216(b). To become a part of the litigation, each "similarly situated" employee must file his or her written consent with the court. *Id*. Employees are "similarly situated" when they "raise a similar legal issue as to coverage, exemption, or nonpayment of [ ] overtime arising from at least a manageably similar factual setting with respect to their job requirements and pay provisions." *Cole v. Universal Health Care/Blumenthal Inc.*, No. 1:24-cv-576, 2025 WL 2378991, at *3 (M.D.N.C. Aug. 15, 2025) (quoting *Solais v. Vesuvio's II Pizza & Grill, Inc.*, No. 1:15-cv-227, 2016 WL 1057038, at *5 (M.D.N.C. Mar. 14, 2016) (citation modified)); *see also Staley v. UMAR Services, Inc.*, 630 F.Supp.3d 707, 711 (M.D.N.C. Sep. 23, 2022).

---

[42] Ferges Depo., at 185:20-187:02 (pre- and post-2020 required work through all or part of meal breaks, including "running the line" and "helping with maintenance"); Glover Depo at 112:6-21 (clocking out, washing hands, and walking to break room); Ford Depo at 62:7-22 (clocking out, removing oil and grease from hands, navigating crowds of people also taking lunch break); Marsh Depo at 130:16-131:9 (same); Ford Depo at 65:6-13 (coming back from lunch five minutes early to "beat traffic" at the time clock and be back at machine on time); Johnson Decl., ¶¶ 14-17 (describing off-the-clock work required during meal breaks after timekeeping policy change); Brandon Decl., ¶¶ 17-21 (same); Ford Decl., ¶¶ 14-15 (same); Keever Decl., ¶¶ 13-14 (same), Long Decl., ¶¶ 15-16 (same); Hairston Decl., ¶¶ 20-24 (same); Booze Decl., ¶¶ 16-20 (same).

[43] *See supra* note 42.

FLSA collective certification typically takes place in two stages. *Cole*, 2025 WL 2378991, at *3 (citing *Hollis v. Alston Pers. Care Servs., LLC*, No. 1:16-cv-1447, 2017 WL 3327591, at *2 (M.D.N.C. Aug. 3, 2017) (other citation omitted)). The first stage is conditional certification, during which the court determines whether the employees' claims are "similarly situated" such that the distribution of court-approved notice to possible class members is merited. *Cole*, 2025 WL 2378991, at *3 (citing *Clark v. Williamson*, No. 1:16-cv-1413, 2018 WL 1626305, at *2 (M.D.N.C. Mar. 30, 2018) (citing *Hollis*, 2017 WL 3327591, at *2) (other citation omitted)). At this preliminary stage, "[c]ollective action plaintiffs are not bound by Rule 23's requirements of numerosity, commonality, typicality and adequacy; they need only demonstrate that they are 'similarly situated' to proceed as a class." *Cole*, 2025 WL 2378991, at *3 (citing *Clark*, 2018 WL 1626305, at *2 (quoting *Robinson v. Empire Equity Grp., Inc.*, No. WDQ-09-1603, 2009 WL 4018560, at *1 n.8 (D. Md. Nov. 18, 2009))); *see also Solais*, 2016 WL 1057038, at *5 n.6. If conditional certification is granted, the putative class members are provided notice of the lawsuit and the opportunity to opt in, and discovery is conducted. *Cole*, 2025 WL 2378991, at *3 (citing *Long v. CPI Sec. Sys., Inc.*, 292 F.R.D. 296, 299 (W.D.N.C. 2013)). If the defendant then moves for decertification, the court proceeds to the second stage, in which the court applies a "heightened fact specific standard to the 'similarly situated' analysis." *Cole*, 2025 WL 2378991, at *3 (other citation omitted).

The conditional certification standard is "fairly lenient," because "the court, and the parties, have minimal evidence at this point in the proceedings." *Cole*, 2025 WL 2378991, at *3 (quoting *Adams v. Citicorp Credit Servs., Inc.*, 93 F.Supp.3d 441, 453 (M.D.N.C. Mar.

10

20, 2015) (citation and internal quotation marks omitted)). To meet this burden, the plaintiff "need only make a relatively modest factual showing that a common policy, scheme or plan that violated the law exists." *Id*. The evidence must amount to "more than vague allegations with meager factual support," but "need not [ ] enable the court to determine conclusively whether a class of similarly situated plaintiffs exists." *Cole*, 2025 WL 2378991, at *3 (citation omitted). At the first stage, "the Court does not resolve factual disputes, decide substantive issues on the merits, or make credibility determinations." *Cole*, 2025 WL 2378991, at *3 (citing *Solais*, 2016 WL 1057038, at *6 (quoting *Adams*, 93 F.Supp.3d at 454)).

Despite the ordinarily lenient standard at the conditional certification stage, courts may discretionarily apply an intermediate standard of review requiring a more stringent showing if the parties have engaged in discovery prior to moving for conditional certification. *Staley*, 630 F.Supp.3d at 712 (citation omitted); *see also Swales v. KLLM Transport Services, L.L.C.*, 985 F.3d 430, 441-42 (5th Cir. 2021).

Here, the Court has indicated that it will (presumably) address the standard applicable to FLSA certification at the January 20, 2026 status conference. *See Ayers*, ECF No. 116 at 12, *Carson,* ECF No. 106 at 12, *Ferges*, ECF No. 109 at 12. Plaintiffs' deadline to amend its prior motions for certification, however, is January 12, 2026. In light of this sequencing, Plaintiffs must proceed under the higher, post-*Swales* "rigorous" standard to ensure the motion aligns with any standard the Court may adopt. Should the Court apply the more traditional notice-stage standard at the conference, this motion necessarily satisfies that lower threshold, as well.

11

**B.**     **Plaintiffs Are Similarly Situated**

Plaintiffs moving for FLSA certification are not required to show all employees they seek to represent are identically situated, as "[d]ifferences as to time actually worked, wages actually due and hours involved are [ ] not significant to this determination." *Romero v. Mountaire Farms, Inc.*, 796 F.Supp.2d 700, 705 (E.D.N.C. 2011); *see also Gionfriddo v. Jason Zink, LLC*, 769 F.Supp.2d 880, 886 (D. Md. 2011) (finding that "similarly situated" need not mean "identical"). Employees may still be deemed similarly situated in instances where there were distinctions in their job titles, functions, and pay. *See Robinson*, 2009 WL 4018560, at *3 (citations omitted); *see also De Luna-Guerrero v. N. Carolina Grower's Ass'n, Inc.*, 338 F.Supp.2d 649, 654 (E.D.N.C. 2004) (citation omitted). Moreover, "a group of potential FLSA plaintiffs is 'similarly situated' if its members can demonstrate they were victims of a common policy, scheme, or plan that [potentially] violated the law." *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 566 (D. Md. Apr. 10, 2012) (citation omitted).

1. Pre-Shift Off-the-Clock Work

All proposed collective members were subject to Defendant's uniform timekeeping policy requiring employees to "clock in at the beginning of their shift" but prohibiting them from clocking in "more than 3 minutes prior to the start of his/her shift."[44] Despite this restriction, Defendant simultaneously required employees "to be at their work station (or the designated meeting place where applicable) at the start of their shift."[45] This created an

---

[44] *See supra* § II(A)(1).
[45] *See id.*

impossible situation: Employees could not clock in early enough to account for necessary pre-shift work, yet faced discipline for not being ready to work precisely when their shifts began.[46]

The evidence demonstrates that this policy applied uniformly across all manufacturing floor employees and created a common scheme requiring unpaid pre-shift work.[47] Employees consistently needed to arrive 10 to 30 minutes before their scheduled shift start times to perform mandatory tasks, including attending pre-shift meetings, communicating with the previous shift about issues, and donning required PPE, such as safety glasses, ear plugs, and steel-toed boots stored in locker rooms because they were covered in toxic machining oils and metal shavings.[48] Defendant's attendance policy created a predictable result: employees at the Roxboro facility performed substantial unpaid pre-shift work to comply with conflicting requirements.[49]

The evidence demonstrates a common policy that applied uniformly to all manufacturing floor employees and systematically resulted in unpaid pre-shift overtime work.[50] Defendant's timekeeping policy affected all employees the same way, making them similarly situated for purposes of FLSA collective certification.[51]

---

[46] *See id.*
[47] *See supra* § II(B)(1).
[48] *See id.*
[49] *See id.*
[50] *See id.*; *see also supra* § II(A)(4).
[51] *See supra* § II(A)(4).

13

### 2. Post-Shift Off-the-Clock Work

The same uniform timekeeping policies that created unpaid pre-shift work also resulted in systematic post-shift violations.[52] Defendant's policy permitted employees to clock out up to 3 minutes before shift end but imposed disciplinary action for clocking out 4 or more minutes early.[53] Even more restrictively, the policy provided that "Employees may not clock out after the end of the shift unless the employee has received approval from his/her manager to continue work after the end of his/her shift."[54] Employees who clocked out after shift end without approval faced discipline and received a quarter point on their attendance record.[55]

This policy created a common scheme whereby employees regularly worked beyond their scheduled shifts to complete required tasks but were disciplined if they accurately recorded this time.[56] The evidence shows this was not a series of individual choices but rather a predictable outcome of Defendant's policies combined with production demands that management knew about and often directed.[57]

As with pre-shift work, the post-shift violations stem from uniform policies applied to all manufacturing floor employees.[58] Management was consistently aware of this work – indeed, often directing it – yet the timekeeping system prohibited accurate recording and

---

[52] *See supra* § II(A)(2).
[53] *See id.*
[54] *See id.*
[55] *See id.*
[56] *See supra* § II(B)(2).
[57] *See id.*
[58] *See id.*; *see also supra* § II(A)(4).

14

imposed discipline for truthful timekeeping.[59] The resulting pattern of unpaid post-shift work was not a series of individual violations but a systematic outcome of Defendant's common policies and practices, which affected all employees the same way and makes them similarly situated for purposes of FLSA collective certification.[60]

### 3. Off-the-Clock Work Through Unpaid Meal Breaks

Defendant promised all hourly employees "a 30-minute duty-free meal period" during which employees would be "completely relieved of their job responsibilities."[61] The meal period was unpaid.[62] However, Defendant's policy required employees to clock out for their meal period exactly at its start and clock in exactly at its end.[63] Employees who took more than 30 minutes or failed to clock out properly could face discipline.[64] In practice, this policy, combined with production demands and the physical layout of the facilities, systematically resulted in employees working through all or part of their unpaid meal breaks.[65]

The meal break violations demonstrate the same pattern as the pre-shift and post-shift claims: uniform policies applied to all manufacturing floor employees that, in combination with production demands and facility logistics, systematically resulted in unpaid work.[66] Employees needed to wash hazardous chemicals from their hands, travel

---

[59] *See supra* § II(B)(2).
[60] *See id.; see also supra* § II(A)(4).
[61] *See supra* § II(A)(3).
[62] *See id.*
[63] *See id.*
[64] *See id.*
[65] *See id.; see also supra* § II(B)(3).
[66] *See supra* § II(A)(4); *see also supra* § II(B)(3).

significant distances to break rooms, and return within exactly 30 minutes, all while being completely responsible for their machines and subject to being called back by supervisors to meet production demands.[67] The result was that employees did not always receive the full 30-minute meal break they were promised.

### C.    The Proposed Notice to Potential Opt-Ins is Appropriate, Accurate, and Informative.

The FLSA "manifests a preference that when collective action certification is granted, a court-controlled notice be provided to potential putative plaintiffs, rather than permitting unregulated solicitation efforts to secure joinder by those individuals." *Staley*, 630 F.Supp.3d at 716 (citing *Adams*, 93 F.Supp.3d at 456 (other citation omitted)). The court plays a managerial role as it oversees the joinder of additional parties in an efficient and proper way, *see Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170-71 (1989), and may exercise "broad discretion." *Roldan v. Bland Landscaping Co.*, 341 F.R.D. 23, 34 (W.D.N.C. 2022) (citing *Hoffman-La Roche Inc.*, 493 U.S.). However, the notice must be "accurate and timely," so that potential plaintiffs "can make informed decisions about whether to participate." *Hoffman-La Roche*, 493 U.S. at 170.

Attached to the instant filing are Plaintiffs' proposed judicial notice and Plaintiffs' proposed opt-in form. *See* Ex. A. The proposed notice describes the lawsuit, informs all individuals who have worked on the manufacturing line at Defendant's Roxboro plant of their opportunity to opt-in, provides instructions on how to opt-in, and explains the effects of their decision. The proposed notice thus achieves the ultimate goal of providing

---

[67] *See supra* § II(B)(3).

employees with accurate and timely notice concerning the pendency of the collective action and should be adopted.

    1.   <u>An Updated Production of a List of Putative Collective Members is Necessary to Facilitate Notice.</u>

As discussed above, all proposed collective members who Defendant employed since January 1, 2020, are "similarly situated." *See generally supra* § III. Disclosure of their identities to Plaintiffs is necessary to provide them with notice of the action. *See Hoffman-La Roche Inc.*, 493 U.S. at 170. Plaintiffs therefore request the following: <u>a list (in electronic, importable, and native format, i.e., an Excel) of all employees since January 1, 2020, including their names, job titles, dates of employment with Defendant, locations of employment with Defendant, last-known mailing addresses, last-known cell phone numbers, last-known home phone numbers, personal email addresses, dates of birth, and last four digits of their SSNs.</u> While courts in the Fourth Circuit have held that plaintiffs must "establish[ ] a need" for such information before it may be turned over, the return of the notice as undeliverable may establish such a need[.]" *See Byard v. Verizon W. Va., Inc.*, 287 F.R.D. 365, 376-77 (N.D.W.Va. Oct. 24, 2012); *see also Rehberg v. Flowers Foods, Inc.*, No. 3:12-cv-596, 2013 WL 1190290, at *7 (W.D.N.C. Mar. 22, 2013); *Chapman v. Saber Healthcare Grp., LLC*, 623 F.Supp.3d 664, 681 (E.D. Va. 2022).

To the extent many Employees may have relocated, obtaining this information will better enable Plaintiffs to reach them so that they may exercise their rights pursuant to any certified collective(s).

17

2. <u>Notice Should Be Sent Via Email, Text Message, and Regular Mail.</u>

Plaintiffs propose the notice be sent via U.S. mail, email, and text message to all current and former Employees who worked for Defendant in Alamance, Sanford, and Roxboro from January 1, 2020 to present. *See Roldan*, 341 F.R.D. at 35 (finding that the prevalence of email filters and the increasingly common use of text messaging for commercial purposes justifies multiple methods of sending notice); *see Lewis v. Precision Concepts Grp., LLC*, No. 1:18-cv-64, 2019 WL 13143749, at *3 (M.D.N.C. July 29, 2019) (same); *see also Butler*, 876 F.Supp.2d at 575 (finding that "communication through email is [now] the norm") (citation omitted); *see also Graham v. Hall's Southern Kitchens, LLC*, 331 F.R.D. 619, 622 (D.S.C. Nov. 27, 2018) (finding notice is appropriate in "today's mobile society"); *Irvine v. Destination Wild Dunes Mgmt., Inc.*, 132 F.Supp.3d 707, 711 (D.S.C. Sep. 14, 2015) (noting that a person's email address and cell phone number are "the most consistent and reliable method of communication" in a mobile society as more traditional methods become obsolete).

Additionally, to ensure Plaintiffs recognize the significance of the notice, posting at Defendant's premises mitigates the uncertainty of notice sent exclusively by mail. *See Lewis*, 2019 WL 13143749, at *3; *Irvine*, 132 F.Supp.3d at 712 (finding the posting of notice at the workplace to be "reasonable and effective"); *Baylor v. Homefix Custom Remodeling Corp.*, 443 F.Supp.3d 598, 609 (D. Md. Mar. 6, 2020) (approving the posting of notice at the employer's worksites).

18

Finally, Plaintiffs also request an opt-in period of seventy-five (75) days from the date of mailing to file their consent forms, a time period consistent with established practice under the FLSA. *Butler*, 876 F.Supp.2d at 575 (finding that numerous courts around the country have authorized 90-day opt-in periods); *see also Baylor*, 443 F.Supp.3d at 609 (finding 90 days is the "standard" notice period for potential plaintiffs to opt-in); *see also Irvine*, 132 F.Supp.3d at 712 (authorizing a 90-day notice period).

## IV.     <u>CONCLUSION</u>

Plaintiffs respectfully request the Court:

1.  Certify three proposed collectives under 29 U.S.C. § 216(b), defined as noted *supra* § I;

2.  Approve the Form of the Notice and Opt-in Form attached together hereto as Exhibit A.

3.  Order Defendant, within 15 days of this Order, to provide Plaintiffs with the names, job titles, dates of employment with Defendant, locations of employment with Defendant, last-known mailing addresses, last-known cell phone numbers, last-known home phone numbers, personal email addresses, dates of birth, and last four digits of SSNs;

4.  Authorize Plaintiffs to distribute the Notice via U.S. mail, email, and text message;

5.  Authorize the posting of the Notice at each of Defendant's operating plants in Alamance, Sanford, and Roxboro;

6.  Authorize a 75-day notice period.

19

Respectfully submitted this December 23, 2025.

/s/ *Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Matthew Marlowe (NCSB No. 60035)
Briahna B. Koegel (NCSB No. 62491)
Samuel Byron Frazelle (NCSB No. 59771)
Laura Fisher (NCSB No. 62357)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
215 S. Academy St.
Cary, NC 27511
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com
bkoegel@gildahernandezlaw.com
sbfrazelle@gildahernandlaw.com
lfisher@gildahernandlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.3(D)(1)

I hereby certify that the foregoing complies with Local Rules 7.3(d)(1), as it contains

**5,272** words, excluding parts of the memorandum that are exempted by LR 7.3(d)(1).

I certify that the foregoing is true and accurate.

Respectfully submitted this December 23, 2025.

*/s/ Gilda Adriana Hernandez*
Gilda A. Hernandez (NCSB No. 36812)
Matthew Marlowe (NCSB No. 60035)
Briahna B. Koegel (NCSB No. 62491)
Samuel Byron Frazelle (NCSB No. 59771)
Laura Fisher (NCSB No. 62357)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
215 S. Academy St.
Cary, NC 27511
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com
bkoegel@gildahernandezlaw.com
sbfrazelle@gildahernandlaw.com
lfisher@gildahernandlaw.com

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' AMENDED MOTION TO CERTIFY THIS MATTER AS A COLLECTIVE ACTION AND FOR COURT-AUTHORIZED NOTICE TO BE ISSUED UNDER SECTION 216(B) OF THE FAIR LABOR STANDARDS ACT** was served in accordance with the Federal Rules of Civil Procedure on the following:

Paul DeCamp (Special Admission)
**EPSTEIN, BECKER & GREEN, P.C.**
1227 25th St., N.W., Suite 700
Washington, D.C. 20037
Tel: (202) 861-1819
Fax: (202) 296-2882
pdecamp@ebglaw.com

Adriana S. Kosovych (Special Admission)
Christopher Coyne (Special Admission)
Eduardo J. Quiroga (Special Admission)
Alexandria K. Adkins (Special Admission)
Christopher Dyess (Special Admission)
**EPSTEIN, BECKER & GREEN, P.C.**
875 Third Avenue
New York, NY 10022
Tel: (212) 351-4500
Fax: (212) 878-8600
akosovych@ebglaw.com
ccoyne@ebglaw.com
equiroga@ebglaw.com
aadkins@ebglaw.com
cdyess@ebglaw.com

Kevin S. Joyner
Vanessa N. Garrido
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
8529 Six Forks Road, Suite 600
Raleigh, North Carolina 27615
Tel: (919) 787-9700
Fax: (919) 783-9412
Kevin.joyner@ogletree.com
Vanessa.garrido@ogletree.com
*Attorneys for Defendant*

                                        /s/ Gilda Adriana Hernandez
                                        Gilda A. Hernandez (NCSB No. 36812)

22

Matthew Marlowe (NCSB No. 60035)
Briahna B. Koegel (NCSB No. 62491)
Samuel Byron Frazelle (NCSB No. 59771)
Laura Fisher (NCSB No. 62357)
**THE LAW OFFICES OF GILDA A. HERNANDEZ, PLLC**
215 S. Academy St.
Cary, NC 27511
Tel: (919) 741-8693
Fax: (919) 869-1853
ghernandez@gildahernandezlaw.com
mmarlowe@gildahernandezlaw.com
bkoegel@gildahernandezlaw.com
sbfrazelle@gildahernandlaw.com
lfisher@gildahernandlaw.com
*Attorneys for Plaintiffs*