# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JAMES AYERS, et al., on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

GKN DRIVELINE NORTH AMERICA, INC.,

     Defendant.

1:23-CV-581

---------------

JOHN CARSON, et al., on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

GKN DRIVELINE NORTH AMERICA, INC.,

     Defendant.

1:23-CV-583

---------------

TAMEKA FERGES, et al., on behalf of themselves and all others similarly situated,

     Plaintiffs,

v.

GKN DRIVELINE NORTH AMERICA, INC.,

     Defendant.

1:23-CV-585

## MEMORANDUM OPINION AND ORDER

Catherine C. Eagles, Chief District Judge.

These three wage-and-hour lawsuits and their predecessor litigation have dragged along for over seven years. Classes and collectives have been certified, decertified, and

denied; discovery has explored every possible factual issue; and motions to amend and to reconsider have been filed.  Now, plaintiffs' counsel seek to certify classes and collectives for claims that arose in 2020.  The plaintiffs have not demonstrated that it would be more efficient and economical to try these employees' claims on a class or collective basis.  Therefore, the motions to certify a class and the motions to certify an FLSA collective will be denied.

## I.     Background

Employees and former employees at three manufacturing plants operated by GKN Driveline North America have brought this trio of cases under the Fair Labor Standards Act and North Carolina Wage and Hour Act.  They allege that GKN's timekeeping policies forced them to work without compensation before and after their shifts and during their meal breaks.  These lawsuits are a continuation of an earlier wage-and-hour lawsuit filed in 2018.

In the predecessor case, employees and former employees of GKN at the same three manufacturing facilities filed a single suit alleging wage and hour violations under the FLSA and NCWHA, seeking certification of an FLSA collective and a Rule 23 class. *Mebane v. GKN Driveline N. Am., Inc.*, 18-CV-892.[1]  The Court conditionally certified a collective and a class to seek relief based on GKN's "policy of rounding time;" "rounding time" in this context referred to GKN's alleged practice of paying employees only for

---

[1] To date there are 281 docket entries in *Mebane*.  The Court has made no effort to provide a detailed summary of those proceedings, summarizing them here and elsewhere in this order only to the extent necessary.  Going forward, all citations to proceedings in that case, 18-CV-892, will be cited as "*Mebane*, Doc. #."

their scheduled hours rather than the hours they actually worked.  *Mebane* Doc. 146 at ¶ 56; *Mebane*, Doc. 82 at 24.[2]  A total of 384 employees opted in to the FLSA action. *Mebane*, Doc. 271 at 2.  The Court later certified an additional Rule 23 class covering the plaintiffs' NCWHA "auto-deduction" claims.  *Mebane*, Doc. 154 at 2, 14.  "Auto-deduction" referred to GKN's alleged practice of automatically deducting 30 minutes from each shift, regardless of whether the employee actually took their meal break. *Mebane*, Doc. 146 at ¶ 56.  But after more discovery, the Court decertified the classes and the collective, finding that individual issues would swamp any attempt to resolve the claims on the class or collective basis.  *Mebane*, Doc. 198.[3]

Some of the opt-in plaintiffs in *Mebane* then filed the three lawsuits now before the court, one lawsuit for each GKN plant in the Middle District.  *Ayers*, 23-CV-581 (Alamance plant); *Carson*, 23-CV-583 (Sanford plant); *Ferges*, 23-CV-585 (Roxboro plant).[4]  Plaintiffs' counsel is the same as in *Mebane*.  The complaints, as amended, included the same alleged violations as in *Mebane*, along with new violations based on changes GKN made to its timekeeping policies in 2020.  Doc. 150 at ¶¶ 48, 50.[5]  In each

---

[2] *Mebane* was largely handled by a different district judge, who has since moved to inactive senior status.

[3] Much later, the *Mebane* named plaintiffs and GKN settled, and the settlement was approved.  *Mebane*, Doc. 266.  Mr. Mebane has appealed the decertification order.  *Mebane*, Doc. 272.

[4] These three cases were initially overseen by the same judge who handled *Mebane*, until that judge moved to inactive senior status.  The cases were reassigned to the undersigned judge on May 21, 2025.

[5] For convenience and unless otherwise noted, all CM/ECF Document citations are only to *Ayers*, 23-CV-581.

lawsuit, the plaintiffs sought certification of an FLSA collective and a Rule 23 class for the same pre-2020 "rounding" and "auto-deduction" FLSA and NCWHA violations alleged in *Mebane* and of an FLSA collective and a Rule 23 class for alleged violations beginning in 2020 after GKN changed its policies. Doc. 71 at 6–7; Doc. 73 at 8. These violations similarly arise out of allegations that GKN required employees to work off-the-clock before and after their shifts began and during meal breaks.

In an earlier order, and after significant discovery, the Court denied certification of the pre-2020 claims on various grounds but held open the possibility of certifying collectives and classes to pursue the claims arising out of the alleged post-2020 employment practices. Doc. 116 at 15–16. The parties were given until December 20, 2025, to complete discovery related to the remaining collective and class claims, *id*. at 17, and the parties report that such discovery is complete. Doc. 140 at 17, 33–34.

The plaintiffs have now refiled their motions to certify an FLSA collective, Doc. 132, and a Rule 23 class. Doc. 134. They also filed a motion for leave to file further amended complaints in each case, seeking to re-add individual pre-2020 claims that they erroneously omitted from the previous amended complaints[6] and add new class and collective claims based on alleged "time-shaving" practices. In a separate order and opinion, Doc. 151, the Court granted in part and denied in part the motions for leave to amend.

---

[6] Amended complaints omitting those claims were only filed in *Carson* and *Ferges*. The then-operative complaint in *Ayers* retained the pre-2020 individual claims.

4

## II. Certification of Collectives and Classes

The FLSA allows a plaintiff alleging a violation of the statute to bring suit on her own behalf and on behalf of other employees who are "similarly situated." *See* 29 U.S.C. § 216(b). When authorized, this kind of case, usually called a "collective," goes forward on behalf of the named plaintiffs and any other similarly situated employees who affirmatively opt-in. *See Degidio v. Crazy Horse Saloon & Rest. Inc.,* 880 F.3d 135, 143-44 (4th Cir. 2018); *Staley v. UMAR Servs., Inc.*, 630 F. Supp. 3d 707, 711 (M.D.N.C. 2022). Courts characterize the decision about whether the employees are "similarly situated" such that the case can go forward on behalf of the group of employees as a "certification" decision. *See, e.g.*, *Staley*, 630 F. Supp. 3d at 711–12; *Myers v. Hertz Corp.*, 624 F.3d 537, 554–55 & n.10 (2d Cir. 2010); *see generally Tyson Foods, Inc. v Bouaphakeo*, 577 U.S. 442, 449 (2016). The "similarly situated" requirement generally involves a determination that it is likely there are common issues "central to the disposition of the FLSA claims" that "can be substantially adjudicated without consideration of facts unique or particularized as to each class member." *Houston v. URS Corp.*, 591 F. Supp. 2d 827, 832 (E.D. Va. 2008).

North Carolina wage and hour law does not have a similar provision, but such claims can be brought as class actions. *See Zelaya v. J.M. Macias, Inc.*, 175 F.R.D. 625, 625–26 (E.D.N.C. 1997); *Beltran-Benitez v. Sea Safari, Ltd.*, 180 F. Supp. 2d 772, 774 (E.D.N.C. 2001). When brought in federal court, such lawsuits are subject to the familiar requirements in Federal Rule of Civil Procedure 23, including numerosity; commonality; typicality; adequacy; and, for a Rule 23(b)(3) class, superiority and predominance.

5

Many wage and hour cases brought in federal court contain both FLSA collective and state law class action claims.  *See, e.g.*, *Tyson Foods*, 577 U.S. at 448; *McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 468 (E.D.N.C. 2010).  Most courts manage FLSA collective cases by ruling on a plaintiff's request for preliminary "conditional" certification fairly early in the case, which if granted is often examined more closely after more discovery.  *Staley*, 630 F. Supp. 3d at 711–12; *Houston*, 591 F. Supp. 2d at 831–32. Class certification motions are similarly taken up after at least some discovery.  *See, e.g.*, *Gbete v. Sampson Bladen Oil Co.*, No. 23-CV-355, 2025 WL 2793791, at \*2 (E.D.N.C. Sept. 26, 2025).

### III.    Proposed Collectives and Classes

The plaintiffs propose the following three FLSA collectives in *Ayers*:

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor at any time between January 1, 2020 through the present who may have been subjected to Off-the-Clock ("OTC") required work activities such as obtaining and putting on personal protective equipment ("PPE"), gathering materials, documenting production, or speaking to coworkers about production issues at least once prior to the start of their shift ("Pre-Shift Off-the-Clock Work Class").

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor between January 1, 2020 through the present who may have been subjected to Off-the-Clock ("OTC") required work activities such as cleaning workstation, talking to coworkers about production, and removing and/or disposing of personal protective equipment ("PPE") at least once following the end of their shift ("Post-Shift Off-the-Clock Work Class").

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor between January 1, 2020 through the present who may have been subjected to Off-the-Clock ("OTC") required work activities such as removing and disposing

6

of personal protective equipment ("PPE") and washing hands of hazardous chemicals prior to meal breaks, at least once during their meal break ("Meal Break Off-the-Clock Work Class").

Doc. 133 at 6–7. The definitions in *Carson* and *Ferges* differ only by swapping the Alamance facility for Sanford and Roxboro respectively. *See Carson* Doc. 123 at 6–7; *Ferges* Doc. 127 at 6–7.

The three proposed NCWHA classes in *Ayers* are:

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor at any time between January 1, 2020, through the present who may have been subjected to Off the Clock ("OTC") required work activities such as obtaining and putting on personal protective equipment, ("PPE") gathering materials, documenting production or speaking to coworkers about production issues at least once prior to the start of their shift (the "Pre-Shift OTC Work Class").

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor between January 1, 2020, through the present who may have been subjected to Off the Clock ("OTC") required work activities such as cleaning workstation, talking to coworkers about production, and removing and/or disposing of personal protective equipment ("PPE") at least once following the end of their shift (the "Post-Shift OTC Work Class").

All nonexempt hourly employees who have worked at Defendant GKN's North Carolina facility in Alamance on the manufacturing floor between January 1, 2020, through 2023 or the date on which GKN began paying hourly employees for their meal breaks, who may have been subjected to Off the Clock ("OTC") required work activities such as removing and disposing of personal protective equipment ("PPE") and washing hands of hazardous chemicals ultimately reducing GKN's promised "duty free" thirty (30) minute meal break policy, at least once during their meal break (the "Meal Break OTC Work Class").

Doc. 135 at 7–8. Again, the definitions in *Carson* and *Ferges* differ only in the facility location. *See Carson*, Doc. 125 at 7–8; *Ferges*, Doc. 129 at 7–8.

7

## IV. Efficiency and Economy of Litigation

The goals of both FLSA collectives and class actions are laudable:  the "promotion of efficiency and economy of litigation." *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 349 (1983); *accord Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989).  But the mere fact that employees are similarly situated or that there are common questions of law or fact does not by itself result in efficiency and economy of litigation; those are not prophecies fulfilled by the act of certification.

Wage and hour class and collective actions can be complicated cases to try, as the Supreme Court has recognized.  In *Tyson Foods*, a case that involved donning and doffing protective gear, the Court examined these problems under the class certification lens[7] and wrestled with how the plaintiffs could prove liability, injury, and damages without many mini-trials.  577 U.S. at 453–60.  The Court provided further guidance on the admissibility and sufficiency of representative proof, a common way parties try such cases, and remanded for consideration of whether the employer had invited error on the injury question by objecting to bifurcation.  *Id.* at 459–62.  The Chief Justice concurred, pointing out with specificity some of the difficulties that arise when every class member may not have been injured by the employer's policies.  *Id.* at 466 (Roberts, C.J., concurring).

---

[7] The Court assumed without deciding that "the standard for certifying a collective action under the FLSA is no more stringent than the standard for certifying a class under the Federal Rules of Civil Procedure." *Tyson Foods*, 577 U.S. at 452.  There were also apparently no differences between the state law at issue and the FLSA in that case, so the Court made "no distinction . . . between the requirements for the class action raising the state-law claims and the collective action raising the federal claims." *Id.* at 453.

8

In other words, to reach a fair result efficiently, these cases require planning, structure, and management, work largely done by plaintiffs and their counsel in the first instance. These cases depend on organization: organized presentation of claims, organized discovery and motions practice, and organized submission of evidence.

Those manageability principles are explicit in the requirements for a proposed Rule 23(b)(3) class like this one; courts must consider whether the class action is "superior to other methods for fairly and efficiently adjudicating the controversy" and, as part of considering whether common issues predominate over individual issues, take into account "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(d)(1)(A) (authorizing courts to issue orders preventing undue complication); *see generally Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 433 (4th Cir. 2003) (noting the potential for manageability problems in a class action); *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177, 185 (4th Cir. 1993) (discussing the need for discretion by trial courts in evaluating class certification motions in view of the practical problems of administering a lawsuit). And the ability of class counsel to adequately represent the class is part of the equation as well. Rule 23(a)(4); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997).

While courts vary on when manageability issues should be considered in connection with FLSA collective certification, the Supreme Court has emphasized that courts have "a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Hoffmann-La Roche*, 493 U.S. at 170–71; *see also Syrja v. Westat, Inc.*, 756 F. Supp. 2d 682, 689 (D.

9

Md. 2010) (collecting cases on when manageability is best considered).  These

considerations often overlap with the question of whether the proposed collective

members are similarly situated, even if that overlap is not always complete, and wider

case management concerns remain relevant in the collective context.  *See Hoffman-La*

*Roche*, 493 U.S. at 170–71; *Houston*, 591 F. Supp. 2d at 832 (noting the need for

common issues "central to the disposition of the FLSA claims").

## V.      The Plaintiffs Have Not Shown that a Class Action is Superior or that Common Issues Predominate.

"The class action is an exception to the usual rule that litigation is conducted by

and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569 U.S.

27, 33 (2013) (cleaned up).  To qualify for the exception, the plaintiffs "must

affirmatively demonstrate their compliance" with Rule 23.  *1988 Tr. for Allen Child.*

*Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 521 (4th Cir. 2022) (cleaned up).

"Rule 23 does not set forth a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 350 (2011).  The plaintiffs "must be prepared to prove that there are *in fact*

sufficiently numerous parties, common questions of law or fact, etc."  *Id.*

As a threshold matter, Rule 23 requires the proposed class members to be readily

identifiable and the proposed class representatives to be members of the proposed class.

*See Peters v. Aetna Inc.*, 2 F.4th 199, 241–42 (4th Cir. 2021); *Amchem*, 521 U.S. at 625

("A class representative must be part of the class." (cleaned up)); *see generally* Fed. R.

Civ. P. 23(a).  The plaintiffs must then establish the four enumerated requirements of Rule

23(a):  numerosity, commonality, typicality, and adequacy of representation.  *Peters*, 2

F.4th at 241.  Finally, the plaintiffs must establish that the case fits into at least one of the three subsections of Rule 23(b).  *Comcast*, 569 U.S. at 33.

Courts must rigorously assess the proffered evidence.  *Wal-Mart Stores*, 564 U.S. at 350–51.  But they have "wide discretion" in evaluating whether the Rule 23 requirements have been met.  *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010) (cleaned up); *see also Windham v. Am. Brands, Inc.*, 565 F.2d 59, 65 (4th Cir. 1977); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 345 (1979) (noting that district courts "have broad power and discretion vested in them" as to the "certification and management of potentially cumbersome" class actions).

In each of these three cases, the plaintiffs seek certification of three state law wage and hour subclasses under Rule 23(b)(3).  In addition to the prerequisites laid out in Rule 23(a),[8] Rule 23(b)(3) imposes additional requirements on classes seeking certification. The plaintiffs must demonstrate that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The plaintiffs have not met their burden to establish that common questions predominate in these cases or that a class action is superior to other methods.

The predominance requirement is satisfied when "questions of law or fact common to the members of the class predominate over any questions affecting only

---

[8] Because the plaintiffs do not meet the requirements of Rule 23(b)(3), the Court need not address whether the requirements of Rule 23(a) are met.

individual members." *Id.*; *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004). "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one that is susceptible to generalized, class-wide proof." *Tyson Foods*, 577 U.S. at 453 (cleaned up). "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *id.* (cleaned up), and whether a trial meant to resolve class-wide issues will be coherent or will instead devolve into a series of mini-trials. *See Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 328–29 (4th Cir. 2006).

The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). Here, the plaintiffs have not set forth the elements of their NCWHA claims in their briefing, and they have made no effort to show that common questions predominate.

To be sure, they have identified several facts likely to be common to the claims of class members and that might resolve common issues in these cases. Doc. 135 at 21–24; Doc. 146 at 8. But without identifying all of the elements of their cause of action and some discussion of the universe of potential issues in these cases, it is impossible to say whether any particular issue or set of issues predominates. The plaintiffs mention various GKN policies common to the various subclasses, but they gloss over the individual issues inherent in their proposal.

As one district court has persuasively noted, "because the nature of the evidence that will suffice to resolve a question determines whether the question is common or

12

individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D. Md. 2012) (cleaned up). It is the plaintiffs' job to enable the court to make such a prediction, and if they do not do so, the Court has no obligation to become an advocate for the potential class. *See, e.g.*, *Hughes v. B/E Aerospace, Inc.*, No. 12-CV-717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A party should not expect a court to do the work that it elected not to do.").

As the plaintiffs accurately point out, the commonality and predominance requirements are "necessarily intertwined." Doc. 135 at 21 (quoting *Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 679–80 (4th Cir. 2024)). But the plaintiffs make no meaningful distinction between predominance and commonality. Rule 23 requires that they speak to both, and the plaintiffs have not done so.

Even more importantly, the plaintiffs have not demonstrated that a class action in the form they propose would be superior to other forms of adjudication. "The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy.'" *Thorn*, 445 F.3d at 319 (quoting Fed. R. Civ. P. 23(b)(3)). It looks to whether the class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Amchem*, 521 U.S. at 615 (cleaned up).

Rule 23(b)(3) suggests four non-exclusive factors for courts to consider when assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Manageability, the fourth factor, "is, by far, the most critical concern in determining whether a class action is a superior means of adjudication." William B. Rubenstein, 2 *Newberg & Rubenstein on Class Actions* § 4:72 (6th ed. 2025). It "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). The plaintiffs have addressed neither the manageability problems the proposed classes would pose nor the availability of alternative adjudication methods that might more – or less - efficiently address these claims.

The plaintiffs propose no efficient method of resolving class-wide liability and individual damages across three different subclasses, each involving at least six different forms of alleged off-the-clock work, at three different manufacturing facilities. They acknowledge that their theory of liability depends on GKN's alleged de facto off-the-clock work policy rather than any express requirement, Doc. 135 at 24 n.58, but they do not explain how they will efficiently prove that each and every nonexempt employee was subject to that de facto policy and, even more crucially, how each class member was injured by this policy. *See Tyson Foods*, 577 U.S. at 462–64, 466 (Roberts, C.J.,

14

concurring).  There is no meaningful explanation of how they will address differences in alleged off-the-clock duties of employees who do not have the same work responsibility, for example.  *See also infra* at 24–25.  Vague references to representative proof, *e.g.,* Doc. 146 at 8, are insufficient and unpersuasive, particularly when the plaintiffs have had years to think about these problems.  While they implied at a hearing that one trial could cover all issues, *see* Doc. 140 at 17–18, they have not been explicit about whether everything can be resolved in one trial covering pre-shift work, post-shift work, and meal break work, or whether two or even three trials will be needed.

Even if they succeed in establishing liability, the plaintiffs have offered no proposal for addressing damages, which will be individual to each class member.  The possibility of negotiated settlement,[9] does not make a class action manageable.

A court considering class certification cannot simply hope that looming problems will disappear.  Optimism is not a case management strategy.

Given the history of this litigation, it is difficult to see how class resolution will be superior.  Some of the plaintiffs joined the predecessor lawsuit years ago.  Their claims would be straightforward to resolve on an individual basis without requiring proof that GKN has a policy affecting all workers and without complicated representative proof.[10]

---

[9] Even if it did, settlement is unlikely.  Even plaintiffs' counsel has expressed "serious concerns" about the prospects for settlement in these cases.  Doc. 140 at 65; *see also Mebane* Doc. 281 (denying plaintiff's motion for order to show cause why defendant should not be held in contempt for allegedly defying court-approved settlement agreement).

[10] While not completely clear, plaintiffs say that going forward they would not need experts on liability questions but will use them on damages.  Doc. 140 at 16; *but see id*. at 42–43.  GKN apparently contemplates an expert on liability as well as damages.  *Id*. at 35.

15

Yet if these classes are certified, the plaintiffs believe that the parties will need extra time to take more discovery, *e.g., id*. at 15–16, not to mention the expected summary judgment motions, *Daubert* motions, and mandatory class notice process.

The manageability concerns are amplified by the plaintiffs' desire to proceed at the same time and in the same proceedings on three FLSA claims that assert federal wage and hour violations based on the same policies. Yet nowhere in their briefing on class certification and on collective certification do they explain how the factual and legal issues will be different or the same for these causes of action and subclasses or how they propose to manage any differences.[11]

Finally, the history of this case and its predecessor litigation offers no reason to expect things to improve. While some of the delay has resulted from the assignment of a new judge in the middle of the case, *see* Doc. 94, much more has been caused by the plaintiffs, who have not demonstrated the organization, diligence, and mindset required to prosecute a complex case. *See, e.g.*, Text Order 01/23/2024; Doc. 113 at 3; Doc. 129 at 2 n.1; Text Order 06/08/2025; Doc. 140 at 12–14, 18–19; *Mebane* Text Order 09/16/2019; *Mebane* Doc. 61; *Mebane* Doc. 271 at 7–8; *Mebane* Doc. 281.

Take a recent example: in their initial motion for class certification, the plaintiffs barely mentioned the post-2020 claims at issue here. *See* Doc. 116 at 11. The Court had

---

[11] As one example of a potential pitfall, the proposed meal break class and collective definitions refer to different employment dates. The proposed class definition is limited to "2023 or the date on which GKN began paying hourly employees for their meal breaks." Doc. 135 at 8. But the proposed collective definition includes no such limitation, instead defining the collective as employees "through the present." Doc. 133 at 7. The discrepancy remains unexplained.

16

to authorize more discovery and supplemental briefing on that aspect of the case, causing a delay of several months. *Id.* at 11–12. Then the plaintiffs filed amended complaints, *Carson*, Doc. 135; *Ferges*, Doc. 140, that left out the individual pre-2020 claims of the named plaintiffs that the Court had already allowed to go forward, Doc. 116 at 11, due to an "oversight." Doc 140 at 45.[12] This necessitated another motion to file an amended complaint. *See Carson*, Doc. 132; *Ferges*, Doc. 136.

Plaintiffs' counsel does not seem able to handle ordinary litigation problems and has filed several "emergency" motions and amended "emergency motions." *See, e.g.*, Docs. 48, 56, 58, 118.[13] And after years of discovery in the predecessor case and these cases during which plaintiffs and opt-in plaintiffs repeatedly testified about time-shaving, the plaintiffs disingenuously claim to have only recently discovered a new "time-shaving claim." Doc. 142 at 17; *see* Doc. 151 (order denying in part motion for leave to amend based, *inter alia*, on lack of due diligence by plaintiffs). This constant effort to expand the case and the claims, especially when obstacles are encountered, may speak well of

---

[12] Indeed, plaintiffs' counsel initially did not seem aware of this omission until it was pointed out by the Court during a hearing. *See* Doc. 140 at 4 (Court question); *id.* at 12–14 (counsel's statement that she could not confirm the claims were omitted with the information in front of her, but if it was, it was "inadvertently omitted"). After a recess, counsel asserted that the individual claims had been removed because class and collective certification of the pre-2020 claims was denied, *id.* at 45, a puzzling conclusion from which counsel quickly backpedaled. *See id.* (addressing Court's confusion by stating that the omission was "just an oversight.").

[13] The Court appreciates that GKN's conduct in this litigation has caused some of the plaintiffs' difficulties. *See, e.g.*, Doc. 116 at 11 (noting defendants' contributions to a confused record); Text Order 06/25/2024 (noting, *inter alia*, defendant's decision to ignore magistrate judge's discovery order). But when one takes into account the predecessor litigation in *Mebane,* it has been clear for years that GKN intended to hold the plaintiffs to their burden of proof at every stage on every issue, as is their right, and its occasional unjustified recalcitrance does not excuse the plaintiffs from being prepared to meet their burdens.

counsel's persistence.  But it speaks poorly of their organization and management skills and shows a fundamental disregard for the need for efficiency.

Plaintiffs' counsel is also not a reliable narrator of the record.  At several points in the plaintiffs' briefing on these motions, counsel's claims about the evidence are inaccurate at best and misrepresentations at worst.  *Contrast, e.g.*, Doc. 135 at 12 n.29 (citing Doc. 71-22 at ¶¶ 9–11 and Doc. 71-23 at ¶¶ 9–10 for the fact that employees continued to work after clocking out), *with* Doc. 71-22 at ¶ 10 ("I would clock out after completing the additional fifteen (15) minutes of extra work."), *and* Doc. 71-23 at ¶ 11 ("I always clocked in/out consistent with the work I was completing – whether arriving early and before the start of my shift or staying late.").  This further erodes the Court's confidence in plaintiffs' counsel's ability to handle these cases as proposed.

When a party proposes to unite three fact-intensive cases, each made up of three subclasses involving at least six different kinds of alleged work activities,[14] occurring at three different facilities, they bear the burden to show that common issues predominate and can be managed such that class resolution is superior to any alternative.  *See Gregory v. Finova Cap. Corp.*, 442 F.3d 188, 190 n.3 (4th Cir. 2006) ("As long as the class action

---

[14] The proposed "Pre-Shift OTC Work Class" involves alleged work activities of obtaining and putting on personal protective equipment, ("PPE") gathering materials, documenting production or speaking to coworkers about production issues.  Doc. 135 at 7.  The proposed "Post-Shift OTC Work Class" involves alleged work activities of cleaning workstation, talking to coworkers about production, and removing and/or disposing of PPE when the shift ends.  *Id.* at 7–8.  The proposed "Meal Break OTC Work Class" involves alleged work activities of removing and disposing of PPE and washing off hazardous chemicals.  *Id.* at 8.  It is not clear if all non-exempt employees have to do all of these things or if that depends on the kind of work they do.

18

is not superior to one method, it makes no difference whatsoever that the class action is superior to other methods.").  But here, the plaintiffs barely address this issue at all.

The plaintiffs contend that "individualized lawsuits would be financially burdensome."  Doc. 135 at 25.  But the wage and hour claims in these three cases do not appear to involve the sort of small dollar claims that make class adjudication all but essential.[15]  *See In re Baycol Prods. Litig.*, 218 F.R.D. 197, 210 (D. Minn. 2003) ("The most compelling rationale for finding superiority in a class action is whether the class action is a negative value suit.").

In *Mebane*, the individual plaintiffs settled their wage and hour claims for about $27,000 and $3,000 each.  *Mebane*, Doc. 231 at 2.  While not astronomical figures, those amounts are a far cry from the sort of *de minimis* claims over which no sensible person would ever sue absent a class action.  *Cf. Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (pointing out that "only a lunatic or a fanatic sues for $30.").  Recovery of attorney fees and costs is also permitted under state law for these types of claims, which further undermines the necessity of a class action.  *See, e.g.*, *Chittick v. Freedom Mortg. Corp.*, No. 18-CV-1034, 2021 WL 5326407, at *10 (E.D. Va. May 7, 2021) ("While the prospects for an award of attorney's fees does not by itself negate the superiority of the class action device, it certainly encourages individuals to file meritorious claims." (cleaned up) (citing *Glover v. Standard Fed. Bank*, 283 F.3d 953, 965 (8th Cir. 2002)); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996).  Nor

---

[15] Courts often refer to these as "negative value suits."  *See generally* William B. Rubenstein, 2 *Newberg & Rubenstein on Class Actions* § 4:87 (6th ed. 2025).

19

have the plaintiffs addressed why administrative proceedings through the North Carolina Department of Labor's Wage and Hour Bureau would not be suitable. *See* N.C. Gen. Stat. § 95-25.15; 13 N.C. Admin. Code §§ 12.0601–12.0602, 12.604; *see also Ostrof v. State Farm Mut. Auto. Ins. Co.*, 200 F.R.D. 521, 532 (D. Md. 2001) (noting that "allowing for pursuit of claims in the administrative forum is often deemed superior to aggregating all the claims into a class action suit.").[16]

In their brief, the plaintiffs characterize the manageability factor as merely a question of class size, stating that "this class action would involve hundreds of Plaintiffs, so it is readily manageable, particularly compared to classes in other larger cases that have been managed successfully." Doc. 135 at 26. But manageability is not a matter of numbers. *See generally* William B. Rubenstein, 2 *Newberg & Rubenstein on Class Actions* § 4:72 (6th ed. 2025) ("[T]he sheer size of a class is rarely itself a reason for finding litigation of its claims unmanageable.").

Instead, manageability is the practical side of the predominance and superiority inquiry. Even when common issues predominate in an abstract sense, "that does not mean that individual issues are manageable." *Koepplinger v. Seterus, Inc.*, No. 17-CV-995, 2020 WL 5705915, at *2 (M.D.N.C. Aug. 26, 2020); *Haley v. Medtronic, Inc.*, 169

---

[16] Such consideration of administrative options is not always necessary. But given the other manageability problems here, an administrative alternative does not seem so farfetched as to warrant no consideration. Although the parties did not raise this possibility, a "district court has an independent obligation to perform a rigorous analysis to ensure that all of the class certification prerequisites have been satisfied." *Career Counseling, Inc. v. AmeriFactors Fin. Grp.*, 91 F.4th 202, 206 (4th Cir. 2024) (cleaned up); *Daniels v. City of New York*, 198 F.R.D. 409, 413 n.5 (S.D.N.Y. 2001) ("[T]he court has an independent duty to determine the propriety of class certification and is not limited to the arguments made by the parties."); *Herkert v. MRC Receivables Corp.*, 254 F.R.D. 344, 348 (N.D. Ill. 2008) (same).

20

F.R.D. 643, 651–52 (C.D. Cal. 1996). Despite years of litigation against GKN over wage and hour matters and two previous orders by two district judges denying certification of similar claims, the plaintiffs do not explain in concrete terms how they plan to address the obvious manageability issues in these cases.

Manageability, of course, does not require that a class action case must be simple or without difficulty. If it did, few if any claims would be appropriate for class resolution. The Court has certified several dozen class actions over the past fifteen years and is familiar with how to deal with disagreements between parties about managing and trying common and individual issues. The problem here is not that management might be hard or require judicial oversight. It is that the plaintiffs proffer no plan for management. And the Court has no confidence that counsel will devise a workable plan.

The plaintiffs have not affirmatively demonstrated that common issues predominate in these cases. Nor have they shown that the proposed class actions would be manageable and thus superior to any available alternative. The motions for class certification will be denied.

## VI. A Collective Will Not Be Efficient or Economical

As noted *supra*, the FLSA allows a plaintiff alleging a violation of the statute to bring suit on her own behalf and on behalf of other employees who are "similarly situated" and "opt-in" to the case. The burden on the plaintiffs to meet the "similarly situated" standard is less demanding than that required to certify a Rule 23 class,[17] and

---

[17] The Fourth Circuit has not spoken to this issue, but there is consensus on this point among district courts in this circuit. *See, e.g.*, *Pontones v. San Jose Rest. Inc.*, No. 18-CV-219, 2019 WL

whether the plaintiffs and opt-in plaintiffs here are similarly situated and whether fairness and procedural considerations support certifying a collective is a closer question than the Rule 23 class certification just discussed. But even with the lower standard, the result is the same.

As this Court has said before, *Ayers v. GKN Driveline N. Am., Inc.*, No. 23-CV-581, 2025 WL 2986843, at *2 (M.D.N.C. Oct. 23, 2025), the decision to certify an FLSA collective, "like the decision on class certification under Rule 23, remains soundly within the discretion of the district court." *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001); *accord Randolph v. PowerComm Constr., Inc.*, 309 F.R.D. 349, 368 (D. Md. 2015); *see also Degidio*, 880 F.3d at 143–44 (noting the need for court involvement in the notice process). In the absence of textual guidance from the FLSA or binding appellate precedent, district courts in this circuit often use a two-step analysis when considering collective certification. *See, e.g.*, *O'Quinn v. TransCanada USA Servs., Inc.*, 469 F. Supp. 3d 591, 604 (S.D.W. Va. 2020) (collecting cases).

The first step, called "conditional certification," occurs early on in a case and is often decided on the pleadings and affidavits alone, without the benefit of extensive discovery. *Hipp*, 252 F.3d at 1218; *see Marroquin v. Canales*, 236 F.R.D. 257, 259–60 (D. Md. 2006). "Because the court has minimal evidence, this determination is made using a fairly lenient standard." *Hipp*, 252 F.3d at 1218 (cleaned up); *Staley*, 630 F. Supp. 3d at 712.

---

5680347, at *4 (E.D.N.C. Oct. 31, 2019); *Dorsey v. TGT Consulting, LLC*, 888 F. Supp. 2d 670, 687 n.14 (D. Md. 2012) (collecting cases).

If a collective is conditionally certified, and after discovery and a notice to potential collective members of their right to opt-in, defendants regularly file a decertification motion at the close of discovery, which triggers the second step. *Hipp*, 252 F.3d at 1218. But "[w]here substantial discovery has been completed, courts may proceed directly to the 'second step' of the certification inquiry." *Heard v. W. Va. United Health Sys.* ("*Heard I*"), No. 23-CV-64, 2025 WL 3772677, at *3 (N.D.W. Va. Sep. 9, 2025) (citing *Smith v. T-Mobile USA, Inc.*, No. 05-CV-5274, 2007 WL 2385131, at *4 (C.D. Cal. Aug. 15, 2007) (collecting cases)).

At the second step, the district court assesses the fully developed record and applies a more stringent, fact-specific standard of review. *Pelczynski v. Orange Lake Country Club, Inc.*, 284 F.R.D. 364, 368 (D.S.C. 2012); *Weckesser v. Knight Enters. S.E., LLC*, 391 F. Supp. 3d 529, 532 (D.S.C. 2019). That standard considers "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations." *Pelczynski*, 284 F.R.D. at 368 (cleaned up); *Heard I*, 2025 WL 3772677, at *6; *see also Thiessen v. Gen. Elec. Cap. Corp.*, 267 F.3d 1095, 1103, 1105 (10th Cir. 2001).

The parties report that fact discovery in these cases is complete. Doc. 140 at 17, 39.[18] So the Court will assess the plaintiffs' motions using the second-step framework. *See Heard I*, 2025 WL 3772677, at *3.

---

[18] Defendants have indicated that if the collective is certified and more plaintiffs opt-in, they will want to depose at least some of those persons. Doc. 140 at 33–34.

23

Here, the plaintiffs have made a reasonable showing that all the non-exempt employees at these three manufacturing facilities are subject to the same policies. At the start of a shift, for example, no one can clock in more than three minutes before their scheduled start time, anyone who needs PPE must have it on before entering the factory floor, and everyone has to be at their workstations by their scheduled start times. Doc. 71-8 at 16; Doc. 71-11 at 3; Doc. 71-12 at 2. But that is just the tip of the iceberg, and, as with their class certification motion, the plaintiffs have failed to go below the surface.

These proposed collectives, like the proposed classes, cover a variety of alleged work activities, including donning and doffing PPE, cleaning up workstations, washing off chemicals, and more. *See* Doc. 133 at 6–7. Each one of these activities will have to be examined at trial to determine if they constitute "work" for which the employer must pay wages.[19] If they are, there will be questions about whether each of these tasks can be done in the time allotted by GKN. For the proposed meal break subclass, the claims would depend, at least in part, on whether supervisors individually called employees back to work early. *See id*. at 14–15. It is also not clear that every employee within the collective definition is required to wear PPE (much less the same types of PPE),[20] needs

---

[19] Under federal law, employers must pay all employees for all time worked. "Work" means time spent in physical or mental exertion (whether burdensome or not) controlled or required by the employer and for all time pursued necessarily and primarily for the benefit of the employer or the employer's business. An employee's time constitutes working time if the employee's time was spent predominantly for the employer's benefit and not for the employee's benefit. *See generally Figueroa v. Butterball*, LLC, 164 F.4th 312, 323 (4th Cir. 2026).

[20] The voluminous citations provided by the plaintiffs muddied the waters on this instead of clarifying the question. Doc. 133 at 11–12 nn. 31–32.

24

to wash off hazardous chemicals, or has clean-up responsibilities; from the evidence, it seems more likely that this will differ depending on an employee's work assignment.

As noted *supra*, for an FLSA collective to proceed on a group basis, the standards in Rule 23 do not have to be met; the statute authorizes aggregation of individual claims when employees are "similarly situated." 29 U.S.C. § 216(b). While there is no explicit requirement that such collective proceedings be manageable, the purpose behind such proceedings shows that manageability is an inherent aspect of the decision to proceed with a collective. And collective adjudication only enhances efficiency and economy of litigation when a unified proceeding would resolve common issues critical to liability in a streamlined manner. Thus, district courts routinely take into account "fairness and procedural considerations" in deciding whether to certify a collective. *See supra* at 23.

Some 176 employees across the three plants have opted in to these cases already.[21] Doc. 140 at 36. It is likely that more would join if notice was given, though the final number is of course unknown. Just as with the proposed classes, trying a case involving that many plaintiffs is neither inherently easy nor inherently difficult; the rub is whether the opt-in plaintiffs are so "similarly situated" that their claims can be resolved, for the most part, in one proceeding.

Yet the plaintiffs have not proposed any plan, much less a workable plan, for the aggregation of all these claims. They have not mapped out what the issues will be in these cases; which issues will involve common questions; and which, if any, will involve

---

[21] At the January 2026 hearing, plaintiffs' counsel made clear that they would ask to consolidate these three cases for trial. Doc. 140 at 15.

individual proof.  They have not explained how they will manage presenting evidence on all the different work activities at issue and three different plants.  One can guess from the plaintiffs' brief that they intend to prove liability through "representative proof" via testimony from employees, but the plaintiffs' collective certification briefing does not even mention the phrase "representative proof."  *See* Docs. 133, 145.  And as with their class certification briefing, the factual representations about the evidence in the plaintiffs' briefing on an FLSA collective do not always hold up to scrutiny.  *See, e.g.*, Doc. 133 at 15 n.41 (citing numerous depositions and declarations discussing experiences under the pre-2020 meal break policy to support proposition that employees were forced to work off-the-clock during their meal breaks under the different post-2020 meal break policy).

Beyond the unaddressed individual liability questions that might exist, the plaintiffs also say nothing about how they propose to handle the individual damages questions these claims pose.  To be sure, "differences as to time actually worked, wages actually due and hours involved" do not necessarily defeat a finding that members of a collective are similarly situated.  *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 705 (E.D.N.C. 2011) (cleaned up).  But that does not mean that the complexity of determining each collective member's damages is irrelevant to the collective certification analysis, nor does it excuse the plaintiffs from having a plan for resolving such issues, whether they are simple or complex.

In some FLSA cases, the factfinder can easily make individualized damages determinations using mechanical calculations or existing payroll records.  *See, e.g.*, *Heard v. W. Va. United Health Sys., Inc.* ("*Heard II*"), No. 23-CV-64, 2025 WL 3772675,

at *10 (N.D.W. Va. Oct. 29, 2025). If this is such a case, the plaintiffs have not said so. While they have made vague references to expert testimony about damages at a hearing and in their briefing, *e.g.,* Doc. 140 at 16; Doc. 145 at 7 (reply brief in support that mentions damages once), they have said nothing concrete about how they will prove damages. *See* Doc. 133 (brief in support that never uses the word "damages").[22]

The plaintiffs have not demonstrated that certification of the proposed collectives would advance the goals of § 216(b). If they are unable to make the required showing after over seven years of litigation, there is no reason to think they will be able to do so by the time these cases are called for trial. On the contrary, the available evidence suggests that proceeding on a collective basis would seriously impair the fairness and efficiency interests of the opt-in plaintiffs, not to mention the defendant. The motions for collective certification will be denied.

## VII. Conclusion

Class and collective actions can offer many advantages over individual litigation. They are also not without drawbacks. Plaintiffs bear the burden of demonstrating that the advantages outweigh the drawbacks in a particular case. In these cases, the plaintiffs have not done that; despite over seven years of litigation against GKN and a developed record, they have left many important questions unanswered. As to the proposed classes, the plaintiffs have not shown that common issues predominate or that a class action

---

[22] It is not clear, for example, how or when the plaintiffs propose to prove how many uncompensated minutes any employee worked during their meal break or how much, if any, time over 40 hours any employee worked off-the-clock.

27

would be superior to any alternative form of litigation.  As to the proposed collectives, the plaintiffs have not shown that they are so similarly situated that a collective action would achieve the fairness and efficiency objectives of § 216(b).  The motions for class and collective certification will be denied.

It is **ORDERED** that

1. The plaintiffs' amended motions to certify conditionally as a collective action, *Ayers*, 23-CV-581, Doc. 132; *Carson*, 23-CV-583, Doc. 122; and *Ferges*, 23-CV-585, Doc. 126, are **DENIED**.

2. The plaintiffs' amended motions to certify a class, *Ayers*, 23-CV-581, Doc. 134; *Carson*, 23-CV-583, Doc. 124; and *Ferges*, 23-CV-585, Doc. 128, are **DENIED**.

This the 22nd day of April, 2026.

_____
UNITED STATES DISTRICT JUDGE